IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA          :
                                  :
             v.                   :          1:20CR208-1
                                  :
ALEXANDER HILLEL TREISMAN         :


GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS

NOW COMES the United States of America, by and through Matthew

G.T. Martin, United States Attorney for the Middle District of North Carolina,

and responds to the defendant's motion to suppress (DE #36).  The discovery

of weapons, ammunition, a binary explosive, books, papers, and several

hundred thousand dollars was made by Kannapolis Police Department officers

who were engaged in lawful police conduct, authorized by the community

caretaking function.  Subsequent police actions, informed by this information,

were reasonable under the circumstances.

## PROCEDURAL HISTORY

The defendant, Alexander Hillel Treisman, is charged in a superseding

indictment with one count of possession of child pornography, and two counts

of transportation of child pornography.  (DE #18).  On October 2, 2020,

1

Treisman was arraigned on the superseding indictment, pled not guilty, and was detained awaiting trial. Docket, *Minute Entry* 10/2/2020. The case was continued once by the defendant without objection (DE #30) and was continued a second (DE #32) and third time (DE #35) upon joint motions. The defendant filed a motion to suppress on January 13, 2021 (DE #36) and the Government now responds to this motion.

The child pornography images which provide the basis for these three counts were found on Treisman's Samsung Galaxy S9 cell phone ("Samsung S9") and his Lenovo ideapad 320 laptop computer ("Lenovo laptop").

In his motion to suppress, Treisman alleges that his white 2006 Ford van was unlawfully searched in violation of his constitutional rights under the Fourth Amendment of the United States Constitution. (DE #36, p. 1). As a remedy, he seeks suppression of all evidence resulting from the search of the van, and "all the fruits thereof." (DE #36, p. 8). Treisman claims that when police officers first opened the van's door and looked inside, this constituted an unlawful search. (DE #36, pp. 3-4). He also claims that both the decision by the Kannapolis Police Department to honor a bank employee's request to tow the van from bank property and the subsequent inventory search was done without a warrant or pursuant to a legitimate exception to the Fourth Amendment's warrant requirement. (DE #36, p. 8).

2

Neither the Samsung S9, nor the Lenovo laptop were seized from Treisman's van. The claims raised by Treisman's motion to suppress do not withstand constitutional analysis or justify suppression of child pornography videos and images found on Treisman's Samsung S9 cell phone and Lenovo laptop. As such, the motion should be denied.

## STATEMENT OF FACTS

On May 28, 2020, police officers with the Kannapolis Police Department ("KPD") responded to a call for service at the Kannapolis branch of the Fifth Third Bank, located at 606 S. Main Street, Kannapolis, North Carolina in Cabarrus County. A bank employee had contacted KPD about two vehicles that had apparently been left in the bank parking lot. The owners were not present. One vehicle, a white Ford van with an expired California tag, had been left in the bank's parking lot since at least 4 p.m. the day prior. KPD officers could observe through the front windows of the Ford van that there was an assault rifle leaning against the back of a front seat. The rifle had a scope and an extended magazine.

3



The officers also saw a box for a Taurus .380 handgun, a box of 5.56mm ammunition, a large plastic container of Tannerite,[2] and unknown pills in the front passenger area of the van.

---

[1] This photo shows the general location and appearance of the rifle in the front of the van but was taken during the execution of the state search warrant. However, the KPD officer who first saw the gun through the van window is expected to testify that this fairly and accurately shows the location and appearance of the rifle when he saw it.

[2] Tannerite is a binary explosive often used by target shooters. When its binary components are mixed, Tannerite becomes an explosive material. Thus, it is popular among target shooters because it produces an explosion and smoke when hit by a bullet. Tannerite is legal to own and transport in its unmixed form, however, when mixed it can be dangerous depending upon how it is used.



KPD officers ran the license plate information for the tag affixed to the van but were unable to obtain information about a registered owner. Additionally, they were not able to confirm if the Vehicle Identification Number ("VIN") for the vehicle associated with the expired license plate actually matched the van's VIN since the VIN was covered by hotel paperwork and therefore could not be seen from outside the van.

---

[3] This photo shows the container of unmixed Tannerite from the front of Treisman's van. The Tannerite was observed by a KPD officer through the windows of the van in the van's front passenger compartment, however, this photo was taken later during the execution of the state search warrant.

5



Officers asked the bank employee whether the bank's video surveillance might show anyone associated with the van. The officers learned that there was not any video surveillance footage of that part of the parking lot.



---

[4] This photo shows the location of the Holiday Inn paperwork obscuring the van's VIN from the KPD officer's view. The photo was taken during the execution of the state search warrant for the van.

6



Based on the items observed in the front passenger area of the van, the
condition of the van, and the length of time that the van had apparently been
left unattended in the parking lot, KPD officers decided to check the rear of the
van to see if anyone was either in need of assistance or possibly sleeping in the
van.  The van had no rear windows making it impossible for officers to see
inside the van's back compartment.  Further the van had an A/C unit on top of
it suggesting that it could be occupied.  The front and rear doors were locked,
but the van's side door was unlocked, and one KPD officer noted it appeared
the side doors were ajar as if they had not been shut all the way.  KPD officers
opened the door and looked inside the rear cabin.  They saw additional gun
cases in the van but nobody was found inside the van.



Additionally, KPD officers could not easily determine who the van belonged to.  The KPD officers had the expired registration tag run through a database.  The registration information produced by the search only revealed vehicle information and a VIN associated with the tag but did not provide any information about a registered owner.

Having determined that the van was unsecured, possibly abandoned, and contained what appeared to be firearms in the front and rear cabin compartments, KPD officers spoke with the bank manager, who requested that the van be towed from the parking lot.  Since the van was on the bank's private property, KPD officers had the bank manager sign a Property Owner Tow Request, pursuant to department policy.  The KPD contacted a tow company to tow the van and KPD officers began making an inventory of valuable items inside the van prior to it being towed.

8

The officers found several firearms, books about survival, bomb making, improvised weapons, and Islam, numerous electronic devices, a drone, and a large amount of cash banded and sealed in bank bags, estimated to be several hundred thousand dollars.[5] The discovery of these items caused the KPD to believe that the owner of the van was involved in some form of criminal activity. Officers eventually decided to obtain a search warrant for the van based on the nature of its contents as seen during the inventory search. After the decision was made to get a search warrant and while it was being obtained, the van was towed to a KPD storage facility. KPD investigators obtained a search warrant from a state magistrate judge on May 28, 2020, at 4:15 p.m., to search Treisman's van.

After the van had been towed from the bank's parking lot, Treisman returned to the bank driving a green Honda Accord at approximately 3:17 p.m., pulled into the bank's drive-thru teller lane, and inquired about his missing van. The bank contacted KPD and informed them that the owner of the van had returned to the bank. KPD officers responded to the bank and encountered

---

[5] Treisman later told JTTF Investigators the cash was his inheritance from his father. FBI agents confirmed through Treisman's mother that he received a sizable inheritance. FBI agents spoke with employees of a bank in Long Beach, California and confirmed Treisman withdrew the money in cash on or about January 10, 2020.

9

Treisman waiting in the green Honda, which was still in the drive-thru teller lane. The officers ordered Treisman out of the Honda. While detained, Treisman was asked by officers whether he had anything that would harm them. Treisman stated he had nothing on him but added that he had a gun in the Honda.

Inside Treisman's Honda was his dog. A Cabarrus County Animal Control officer responded to the bank to safely remove the dog from the Honda, with the assistance of a KPD officer. The animal control officer decided it would be easiest to remove the dog from the rear of the car using a catch pole. When the rear passenger door was opened, the officer noticed a laundry basket in the dog's way. The officer grabbed the laundry basket and pulled it to the ground next to the Honda. Then the dog was removed from the car.

After Treisman's dog was removed from the Honda, a Cabarrus County Sheriff's Office K-9 handler assessed the Honda with her trained K-9. The handler noted that the K-9 was exhibiting a strong change in behavior when being walked around the front of the car. According to the handler, this strong change in behavior involved the K-9's nostrils flaring, the dog breathing heavy, changing its posture, and wanting to get on top of the hood of the Honda. According to the KPD report, this behavior indicated the possibility of

10

explosives, but not necessarily, as the K-9 was trained to sit when there was a positive alert.

The KPD requested the Cabarrus County Sheriff's Office bomb squad team. The bomb squad arrived at the bank and examined the Honda to determine whether explosive materials were present. Bomb tech officers used a robot to open the vehicle's door and examine the interior. A handgun was seen on a monitor showing the view from the robot's camera. The handgun was in the front of the vehicle, near the stereo system. A bomb tech officer donned a bomb suit and continued to examine the Honda's trunk and the laundry basket beside the car. The bomb tech officer located a second handgun concealed underneath objects inside the laundry basket. A second bomb tech officer donned a bomb suit and examined the interior of the Honda and the engine block. This bomb tech observed the same handgun in the center console, beneath the stereo, where the robot had first revealed the gun. The bomb tech officers did not locate any explosive material in the Honda.

KPD officers obtained a state search warrant for the Honda and seized the firearms. KPD officers identified the first firearm, found near the stereo system, as a Taurus Spectrum .380 caliber, SN 1F039977. KPD officers identified the second firearm, found inside the laundry basket, as an Intratec, model AB-10, 9mm Luger caliber handgun, SN A050018. Treisman's silver

Case 1:20-cr-00208-UA   Document 42   Filed 02/03/21   Page 11 of 26

Lenovo ideapad 320 laptop was also collected from outside the Honda after the bomb squad search of the vehicle. They also located Treisman's wallet in the cupholder between the seats. In addition to other items, the wallet contained the following, each with a photograph of Treisman:

1.  State of Washington Identification Card for Alexander Hillel Treisman, with date of birth December 19, 2000;

2.  State of California Driver License, for Alexander Hillel Treisman, with date of birth December 19, 2000; and

3.  State of Florida Driver License, for Alexander S. Theiss, with date of birth March 29, 1995.[6]

KPD officers took Treisman into custody and transported him to the Kannapolis Police Department. Treisman's cell phone, the Samsung S9 containing the child pornography that was ultimately discovered, was seized from Treisman's right front pants pocket. Treisman was later charged with carrying concealed guns in violation of North Carolina General Statute § 14-269(a1). Treisman did not have a permit to carry a concealed weapon. KPD

---

[6] The Florida Driver License displayed a star in the upper right-hand corner purporting to be Real ID compliant. JTTF Investigators contacted the Florida Department of Law Enforcement and learned the Driver License is counterfeit.

12

investigators obtained a search warrant from a state magistrate judge on May 28, 2020, at 8:30 p.m. to search Treisman's Samsung S9 cell phone.

The Lenovo laptop was originally located in Treisman's Honda Accord. It was removed and placed outside the car during the search for bombs or explosive material. Later that evening, KPD investigators obtained a search warrant from a state magistrate judge at 9:50 p.m. to search Treisman's Honda Accord at which point the laptop was seized. KPD notified FBI agents and Task Force Officers with the FBI Charlotte Joint Terrorism Task Force ("JTTF Investigators") of their investigation and the arrest of Treisman.

After Treisman was arrested on May 28, 2020, a custodial interview was conducted by KPD investigators. Treisman answered questions after being advised of his *Miranda* rights and waiving those rights. Treisman remained in custody after being charged with carrying a concealed weapon. On May 29, 2020, another custodial interview was conducted by JTTF Investigators. Treisman again answered questions after being advised of his *Miranda* rights and waiving those rights. During both interviews, Treisman was asked about the weapons, money, and other materials that were found in his Ford van. He was also asked about his travels and whether he had an interest in mass shootings or terrorism.

13

A FBI Special Agent working with JTTF investigators, obtained a federal search warrant from U.S. Magistrate Judge Joe L. Webster, in the Middle District of North Carolina on June 3, 2020 (1:20MJ151-1) to search Treisman's Samsung S9 cell phone for evidence of violations of 18 U.S.C. § 924(b), transport or receipt of a firearm in interstate commerce with intent to commit a felony offense, and 18 U.S.C. § 922(a)(6), knowingly providing false information in the acquisition of a firearm.[7]  (See Attachment 1).  While searching the Samsung S9 phone for evidence of those crimes pursuant the warrant, JTTF investigators observed images of child pornography.

Another FBI Special Agent then obtained a federal search warrant from U.S. Magistrate Judge David S. Cayer, in the Western District of North Carolina on June 4, 2020 (3:20MJ143) to search Treisman's Samsung S9 cell phone for evidence of child pornography.  The search of the Samsung S9 phone pursuant to this warrant revealed hundreds of images of child pornography.

A FBI Special Agent obtained a federal search warrant from U.S. Magistrate Judge Joe L. Webster, in the Middle District of North Carolina on June 8, 2020 (1:20MJ154-1), to obtain cellular location data from Sprint, the

---

[7] At the point JTTF investigators applied for this warrant, they had determined that Treisman had used the false Florida driver's license under the name Alexander Theiss to purchase a firearm in Washington state in June 2018.

14

cellular service provider for Treisman's Samsung S9 cell phone. A search of this cell location data showed Treisman's Samsung S9 cell phone crossing state lines in and out of North Carolina on May 27, 2020, and May 28, 2020, and at other times.

Another FBI Special Agent obtained a federal search warrant from U.S. Magistrate Judge Joi E. Peake, in the Middle District of North Carolina on July 13, 2020 (1:20MJ199), to search other electronic devices, including the Lenovo ideapad 320 laptop computer from Treisman's Honda, as well as numerous other devices from Treisman's Ford van, for evidence of child pornography. A search of the Lenovo laptop and other devices pursuant to this warrant revealed hundreds of additional images of child pornography.

## DISCUSSION

I.  **Police Officers' Observations of the Contents Inside Treisman's Van after Opening the Side Door, were Lawful Pursuant to the Community Caretaker Doctrine.**

As a preliminary matter, it is without controversy in this case that the KPD officers were entitled to examine the items that were in the cab of the van "in plain view." Additionally, the attempt to establish the identity of the van's owner by running the license plate through various databases is not challenged. As noted above, among the items plainly visible to the officers were an assault rifle, ammunition, a box for another firearm, Tannerite, and

15

unknown pills.

The Supreme Court has long held that law enforcement officers may exercise "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). The Fourth Circuit has recognized the need for this community-caretaking exception because police often come into "contact with vehicles for reasons related to the operation of vehicles themselves" and this "often noncriminal contact with automobiles will bring local officials in plain view of evidence, fruits, or instrumentalities of a crime, or contraband." *United States v. Johnson*, 410 F. 3d 137, 144 (4th Cir. 2005) (quoting *Dombrowski* at 441-442).

Community caretaking functions include established procedures or routine activities such as impounding a vehicle that impedes the safe flow of traffic, entering a car after a traffic accident to assess occupants' medical conditions, or opening a vehicle's trunk compartment to identify the owner. *See South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976); *Johnson*, 410 F.3d 137, 145 (4th Cir. 2005); *Durney v. Doss*, 106 F. App'x 166, 169 (4th Cir. 2004). In *United States v. Powers*, 439 F.2d 373 (4th Cir. 1971), *cert. denied*, 402 U.S. 1011 (1971), a case that preceded *Cady*, the Fourth Circuit permitted a law-enforcement officer, who had "a legitimate ground for

16

checking the identification number" to open the door of a car without a search warrant in order to look for a VIN. *Id*. at 376. The community caretaking exception may not be used as pretext or executed in bad faith. *United States v. Gwinn*, 219 F.3d 326, 335 (4th Cir. 2000) (finding that officer's reentry into suspect's home to obtain suspect's shoes and shirt was not a Fourth Amendment violation). Additionally, the community caretaking exception "is not limited to the least intrusive means of protecting the public." *Johnson* at 146.

The Supreme Court has held that the standard for an officer's use of the community caretaking exception is reasonableness. It has explained:

> [T]he Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only "*unreasonable* searches and seizures." The relevant test *is not the reasonableness of the opportunity to procure a warrant,* but the reasonableness of the seizure under all the circumstances. The test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts.

*Opperman*, 428 U.S. at 373 (1976) (quoting *Coolidge v. New Hampshire*, 403 U.S. at 509-10 (J. Black, concurring and dissenting) (emphasis added)). In this matter, officers were called to the scene by a bank employee regarding a vehicle that had been left overnight in their parking lot. The van had an expired California license plate. Despite running a check of the license through a database, officers were unable to determine the ownership of the

17

van.  Further, a parking pass obscured the vehicle's VIN.  Officers checked

with bank employees and determined that video surveillance at the bank

could not be used to determine the owner of the van and whether the owner

was nearby.  Officers noted at least one rifle with a scope and high capacity

magazine plainly visible in the cab of the van.  They also saw a box for

another gun, Tannerite, a box of ammunition, and unidentified pills.  Officers

examined the van and determined that one door appeared to be slightly ajar

and became concerned that there may be someone inside the van, in part

because of the A/C unit on top of the van.  Further, it was a warm day and

the van's A/C unit was not running.  Given the totality of the circumstances,

officers decided to open the unlocked side door to look inside for any persons.

When they did, they saw what appeared to be gun cases but found no one

inside.

The decision to open the door to potentially locate the owner or other

persons who might be sleeping, injured, or in need of assistance under these

circumstances falls squarely within the community caretaking function.

Contrary to the assertion in the motion to suppress, the officers' display of

firearms did not convert their actions into a criminal investigation.  In light

of the officers' knowledge that an assault weapon was in plain view in the

van's cab, the officers' decision to unholster their weapons was a reasonable

step related to officer safety.

## II. Police Officers Were Justified in Towing Treisman's Van When Requested to do so by the Fifth Third Bank and Properly Inventoried the Contents to Protect the Owner's Property from Loss and to Address the Inherent Danger presented by the Contents.

Like the decision to enter an automobile to determine ownership or check on the welfare of occupants, the Supreme Court has stated that a decision regarding impoundment of a vehicle is a valid "community caretaking" function. *Cady*, 413 U.S. at 441–43 (1973). As noted by the Fourth Circuit, "while [the Supreme] Court has been consistent in holding that inventory searches must be conducted according to standardized criteria, *see Bertine,* 479 U.S. at 374 n. 6, 107 S.Ct. 738 the [Supreme] Court has afforded police more discretion when it comes to the decision to impound vehicles. The *Bertine* Court stated that '[n]othing in *Opperman* or *Lafayette* prohibits the exercise of police discretion [in the impoundment of vehicles] so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.' *Id.* at 375, 96 S. Ct. 3092." *United States v. Cartrette*, 502 F. App'x 311, 315–16 (4th Cir. 2012) (unpublished).

Among the standard criteria courts have endorsed are circumstances where an unattended vehicle can pose a nuisance or a target for theft or

19

vandalism.   *See United States v. Bullette*, 854 F.3d 261 (4th Cir. 2017) (impoundment constitutes a reasonable course of action when the owner of a vehicle abandons it or law enforcement cannot identify the owner);   *United States v. Fort*, 313 F. App'x 665 (4th Cir. 2009) (unpublished) (police officer's decision to have vehicle towed was reasonable and therefore the inventory search was valid after encountering an incapacitated driver and observing in plain view an assault rifle, loaded magazines, ammunition, and police tactical gear); *United States v. Coccia,* 446 F.3d 233 (1st Cir. 2006)[8] (towing of defendant's car from psychiatrist office parking lot was not an unreasonable seizure where vehicle packed with the defendant's belongings was a possible target for theft and police had concerns about whether vehicle contained explosives or biological weapons); *Cabbler v. Superintendent, Virginia State Penitentiary,* 528 F.2d 1142 (4th Cir. 1975) (impoundment and inventory search of a vehicle left in the driveway of a hospital emergency department after driver's arrest); *United States v. Brown*, 787 F.2d 929 (4th Cir. 1986) (police reasonably impounded vehicle either because there was no known individual immediately available to take custody of the car, or because the

---

[8] *But see United States v. Proctor*, 489 F.3d 1348 (D.C. Cir. 2007); *cf. United States v. Smith*, 522 F.3d 405 (3rd Cir. 2008) (following rationale of *Coccia* and declining to follow *Proctor*).

20

car could have constituted a nuisance in the area in which it was parked). As noted above, the owner of the van at the Fifth Third Bank could not be identified. Further, given the presence of dangerous firearms in plain view and the apparent presence of additional firearms in the rear of the van, its contents could have become the target of theft.

In this case, not only did the KPD choose to impound the van pursuant to long recognized legal criteria, but it also towed the van pursuant to its towing policy. KPD officers operate under a standing order that covers when a vehicle should be towed. (See Attachment 2). This policy states in pertinent part:

**G. REMOVAL OF VEHICLES FROM PRIVATE PROPERTY**

1. As a general policy, the Kannapolis Police Department will not remove a vehicle from private property if the owner, occupant, or lessee of such property could have the vehicle removed without police assistance under applicable procedures of law.

2. Complaints regarding vehicles which are "nuisance, junked or abandoned" as defined in the City of Kannapolis Municipal Code and which are located on private property should be referred to the City Zoning Administrator.

3. A police officer shall not authorize the towing of a vehicle from private property without first receiving a written request by the owner, occupant or lessee of the property indemnifying the City against any loss, expense or liability incurred because of the removal, storage or sale thereof. The proper execution of a Property Owner Tow Request form satisfies the requirements of this section. The original copy of this form will be forwarded to Central Records.

KPD officers at the bank considered the presence of at least one firearm, unknown pills, and a binary explosive in the van, combined with their experience with KPD's towing policy, to determine that under such

21

circumstances, Treisman's van was not a vehicle that could be removed by the private property owner pursuant to section one of the towing policy "without police assistance." Further, based upon their experience, this was not a vehicle that was of the type typically referred to the City Zoning Administrator. Since KPD officers determined that they would tow the vehicle from the banks' property, the officers received a written Property Tow Request from a bank employee. (See Attachment 3).

As discussed *supra*, the test for officers exercising the community caretaking function is *reasonableness*. The police only need to show that they made their decision on the basis of something other than suspicion of criminal activity. *Colorado v. Bertine*, 479 U.S. 375, 371-72 (1987). Furthermore, when police have "solid, noninvestigatory reasons for impounding a car, there is not need for them to show that they followed explicit criteria in deciding to impound, as long as the decision was reasonable." *United States v. Fort*, 313 Fed. App'x 665, 667 (2009) (unpublished) (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 787 (1st Cir. 1991)). In this case, **KPD officers were presented with a unique circumstance. They encountered a van which had been left on a private lot overnight and the presence of at least one firearm, unknown pills, and a binary explosive in plain view, as well as additional unsecured firearms in the rear compartment of the van. Despite several**

22

attempts, KPD officers had no way of establishing ownership or knowing when the owner might return to retrieve or secure the van and its contents. Considering all these factors, KPD officers acted reasonably by assisting the bank in towing the van from the parking lot following the bank manager's written request for assistance.

## III. Upon Deciding to Tow Treisman's Van, KPD Lawfully Conducted an Inventory of the Van's Contents Pursuant the KPD Inventory Policy.

Once the decision was made to tow the Ford van, KPD started an inventory of valuable items in the van, also pursuant to KPD policy. The KPD Policy states in part:

### C. INVENTORY SEARCHES

1. The warrantless inventory search of a vehicle towed/impounded pursuant to the direction of a police officer under the provisions of this Order may be conducted provided that:

    (a) A lawful basis exists for taking custody of the vehicle;

    (b) The inventory is non-investigative (officers may not conduct an evidence search under the guise of an inventory search);

    (c) The scope of the search is limited to locating and securing valuables for the mutual protection of the officer, department, and vehicle owner or operator.

2. The purpose of an inventory search is to identify and safeguard property located within the vehicle and is generally limited to those unsecured or readily accessible areas within the vehicle. A locked trunk or glove box may be searched only if the keys are available to the officer. Whenever possible, the inventory search should be conducted at the scene prior to releasing the vehicle to the tow truck operator.

3. Officers are not permitted to break open or damage any locked containers, compartments, luggage or other property located in the vehicle in the course of conducting the inventory search. However, closed containers that can be opened without force or damage may be searched as part of the inventory. Any evidence, contraband, or fruits of a crime discovered during an inventory search may be admissible in a subsequent prosecution.

23

(See Attachment 2, KPD Tow Policy, Section C). Neither a warrant, nor probable cause is required for an "inventory search." *Opperman*, 428 U.S. at 374-76 (1976). An inventory search of a vehicle is properly authorized where "(1) circumstances reasonably justify seizure or impoundment and (2) where law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents." *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017) (internal citations omitted). KPD officers' reasonable and lawful decision to tow the vehicle and the subsequent inventory made pursuant to policy was done in good faith and entirely appropriate. It was during that lawful inventory that additional weapons, books about survival, bomb making, and Islam, a drone, papers, and approximately $500,000 in U.S. currency were discovered.

## CONCLUSION

Since KPD officers' actions related to Treisman's van were reasonable they do not rise to the level of a constitutional violation of the defendant's rights under the Fourth Amendment of the U.S. Constitution. Therefore, the Court should deny the Defendant's motion to suppress the items that were recovered from the Ford van and fruits thereof.

This, the 3rd day of February, 2021.

Respectfully submitted,

24

/S/ MATTHEW G.T. MARTIN
UNITED STATES ATTORNEY


/S/ GRAHAM T. GREEN
Assistant United States Attorney
NCSB #22082
United States Attorney's Office
Middle District of North Carolina
251 N. Main Street, Ste. 726
Winston-Salem, NC  27101
Phone:  336/333-5351


/S/ CRAIG M. PRINCIPE
Assistant United States Attorney
NCSB #44720
United States Attorney's Office
Middle District of North Carolina
251 N. Main Street, Ste. 726
Winston-Salem, NC  27101
Phone:  336/333-5351

25

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA          :
                                  :
            v.                    :          1:20CR208-1
                                  :
ALEXANDER HILLEL TREISMAN         :


CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2021, the foregoing was electronically

filed with the Clerk of the Court using the CM/ECF system to notify:

Samuel J. Randall, IV, Esquire


/S/ GRAHAM T. GREEN
Assistant United States Attorney
NCSB #22082
United States Attorney's Office
Middle District of North Carolina
251 N. Main Street, Ste. 726
Winston-Salem, NC  27101
Phone:  336/333-5351


/S/ CRAIG M. PRINCIPE
Assistant United States Attorney
NCSB #44720
United States Attorney's Office
Middle District of North Carolina
251 N. Main Street, Ste. 726
Winston-Salem, NC  27101
Phone:  336/333-5351