☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

MIDDLE DISTRICT OF NC

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br> )<br>SAMSUNG S9 WIRELESS TELEPHONE )<br>ASSOCIATED WITH NUMBER (206) 293-0658 ) | Case No. 1:20MJ151-1 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Middle_____ District of _____North Carolina_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____June 17, 2020_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____HON. JOE L. WEBSTER_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     6/3/2020 12:24pm

*Judge's signature*

City and state:     DURHAM, NC

HON. JOE L. WEBSTER, U.S. MAGISTRATE JUDGE
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.:<br>  1:20MJ151-1 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| Certification |
|---|

          I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____                    _____
                                                                    *Executing officer's signature*

                                                                    _____
                                                                    *Printed name and title*

# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. 1:20MJ151-1 |
| *or identify the person by name and address)* | ) | |
| SAMSUNG S9 WIRELESS TELEPHONE | ) | |
| ASSOCIATED WITH NUMBER (206) 293-0658 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 942(b) | Receipt or transport of a firearm or ammunition in interstate commerce with the intent to commit a felony |
| 18 U.S.C. § 922(a)(6) | Knowingly providing false information in the acquisition of a firearm |

The application is based on these facts:

See Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ RONALD L. GODFREY
*Applicant's signature*

RONALD L. GODFREY, SPECIAL AGENT, FBI
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: _____ 06/03/2020  12:54pm _____

*Judge's signature*

City and state: _____ DURHAM, N.C. _____

HON. JOE L. WEBSTER, U.S. MAGISTRATE JUDGE
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF SAMSUNG S9 WIRELESS TELEPHONE, ASSOCIATED WITH NUMBER (206) 293-0658, CURRENTLY LOCATED AT KANNAPOLIS POLICE DEPARTMENT | Case No. 1:20MJ151-1 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Ronald L. Godfrey**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since January 2005. I have been assigned to the Joint Terrorism Task Force (JTTF) in the Charlotte Division of the FBI, since 2011.

I am primarily responsible for conducting counterterrorism investigations. My previous assignments in the FBI include investigations pertaining to counterintelligence and computer crimes. I also served as an agent-advisor during the development of the FBI's computerized case management system, and I participated in the development of training materials for that system. I have received training in conducting criminal and intelligence investigations, searches and seizures, and effecting arrests. Additionally, I have completed multiple training courses pertaining to the evidentiary relevance of wireless telephones in investigations, and I have participated in numerous investigations that involved evidence derived from wireless telephones.

3.  I have personally participated in the investigation of the offenses discussed below. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal and state law enforcement officers, and information obtained from interviews and analysis of reports. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is a Samsung S9 wireless telephone contained inside an Otter Box protective case, black in color, associated with telephone number (206) 293-0658, serviced by Sprint, and belonging to Alexander TREISMAN, born December 19, 2000 (the "Device"). The Device is currently located at the Kannapolis Police Department (KPD), 401 Laureate Way, Kannapolis, North Carolina.

5.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

6.      The applied-for warrant would authorize the search for any responsive evidence since January 1, 2018.[1]

7.      I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the KPD.

---

[1] JTTF Investigators determined TREISMAN purchased a firearm using a counterfeit Florida Driver License in or around June 2018. The significance is explained in greater detail below. I am requesting a date range of January 1, 2018, to the present to capture any evidence related to that initial purchase.

3

## PROBABLE CAUSE

8.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe TREISMAN received a firearm with the intent to commit an offense, in violation of Title 18, U.S.C. Section 924(b), and knowingly provided false information in connection with the acquisition of a firearm, in violation of Title 18, United States Code, Section 922(a)(6) (the "Target Offenses"). Specifically, TREISMAN used a false name to purchase a Kel-Tec firearm and received and transported firearms and ammunition in interstate commerce with the intent to commit an offense, punishable by imprisonment for a term exceeding one year.[2]

9.     TREISMAN had control, use of, and/or access to the Device that is the subject of this warrant. Based upon my training and experience, those who possess firearms unlawfully or for an unlawful purpose, often display

---

[2] There is probable cause to believe TREISMAN intends to carry out a mass shooting, punishable under numerous North Carolina criminal statutes, including but not limited to the following: felonious assault with deadly weapon with intent to kill or inflicting serious bodily injury, a Class C felony, in violation of North Carolina General Statute (NCGS) section 14-32; assault inflicting serious bodily injury, a Class F felony, in violation of NCGS section 14-32.4; murder in the second degree, a Class B1 felony, in violation of NCGS section 14-17(b); and murder in the first degree, a Class A felony, in violation of NCGS section 14-17(a). The act contemplated by TREISMAN is similarly punishable in any state by imprisonment for a term exceeding one year.

4

those firearms on social media platforms, instant messaging or other applications, and or make statements about the firearms by utilizing their wireless telephones. Photographs and videos of firearms, as well as the possible photographs of where the firearms were purchased are typically stored in the wireless telephones. Those who engage in the unlawful possession and sale of firearms utilize wireless telephones to facilitate the purchase, sale, or trade of the firearms. There is probable cause to believe the Device contains evidence, as detailed in Attachment B, of the Target Offense.

## KANNAPOLIS POLICE DEPARTMENT INVESTIGATION

10.    On May 28, 2020 at approximately 11:00 a.m., KPD officers responded to a report of an abandoned vehicle in the parking lot of the Fifth Third Bank, 606 South Main Street, Kannapolis, North Carolina. Bank employees first noticed the vehicle in the parking lot around closing time on May 27, 2020. No one was around the van at the time.

11.    The KPD officers identified the abandoned vehicle as a white Ford E350 van, bearing expired California license plate 8E43177. The officers ran the license plate and obtained an  associated Vehicle Identification Number (VIN) but were unable to locate identifying information about the registered owner. Further, the officers were unable to

5

confirm the VIN associated with the license plate matched the VIN on the van because a parking pass covered the VIN plate.

12.     The KPD officers looked through the van windows to determine whether anyone was inside the van and observed an AR-15 style rifle behind the driver's seat; a box for a Taurus .380 handgun laying in the passenger floorboard; a canister of Tannerite[3]; and a box of 5.56 caliber ammunition. Officers then checked the van doors and found the back-right side door was unlocked. Officers opened the van door to determine whether anyone was inside needing help. Officers did not find anyone but observed several gun cases in the back of the van.

13.     The bank branch manager signed a Property Owner Tow Request, asking KPD to tow the van. The KPD officers initiated an inventory search of the vehicle pursuant to KPD policy. The officers found several firearms; books about survival, bomb making, improvised weapons, and

---

[3] Tannerite is a binary explosive often used by target shooters. Tannerite is popular because it produces a loud bang and smoke when hit by a bullet. Tannerite is legal to own and transport in its unmixed form.

6

Islam; and a large amount of cash banded and sealed in bank bags, estimated to be hundreds of thousands of dollars[4].

14.    The KPD officers terminated the inventory search; towed the van to the KPD secure storage facility; and obtained a state search warrant for the vehicle.  Pursuant to the state search warrant, the officers discovered the following firearms in the van:

   a.  Sig Sauer (Sig Sauer Inc, Exeter, NH USA) AR rifle, unknown
       caliber, unknown model, Serial Number (SN) 20J041880;

   b.  Intratec 9mm Luger, model TEC-DC9, SN D125073;

   c.  Lower AR receiver – Anderson Manufacturing, model AM-15,
       multi-caliber, SN 16195421;

   d.  Kel-Tec Sub-2000, SN FTC43;

   e.  A rifle marked ArchAngel (possibly a Ruger 10/22 rifle) .22
       caliber, SN 259-20969; and

_____

[4] TREISMAN later told JTTF Investigators the cash was his inheritance from his father. FBI agents confirmed through TREISMAN's mother that he received a sizable inheritance. FBI agents spoke with employees of a bank in Long Beach, California and confirmed TREISMAN withdrew the money in cash on or about January 10, 2020.

f. Russian Mosin Nagant M91/30, bolt action rifle, 7.62 x 54R (PW
   Arms Redmond, Washington), Russian SN RMN042789 (6622 on
   bolt and trigger well).

15.    After the van was towed and KPD officers left, a bank employee
again contacted KPD. The employee reported that a white male (later
identified as TREISMAN) arrived at the Fifth Third Bank driving a green
Honda Accord, pulled into teller drive-through lane #2, and asked about his
white van being towed.

16.    KPD officers responded to the bank and encountered TREISMAN
waiting in the green Honda in the drive-through teller lane. The officers
conducted a felony traffic stop and ordered TREISMAN out of the Honda.
While detained, TREISMAN was asked by officers whether he had anything
that would harm them. Later, TREISMAN made a spontaneous utterance in
which he advised that there was a gun in the Honda. A Cabarrus County
Deputy K-9 handler assessed the Honda with her explosive-trained K-9 and
observed the K-9 exhibiting a strong change in behavior when being walked
around the front of the car.

17.    The Cabarrus County bomb squad arrived and examined the
Honda to determine whether explosive materials were present. Bomb tech

8

officers used a robot to open the vehicle's door and examine the interior, and observed a handgun in the front of the vehicle, near the stereo system. A bomb tech officer donned a bomb suit and continued examining the vehicle. The bomb tech officer located a second handgun in a clothes hamper. The bomb tech officers did not locate any explosive material in the Honda.

18.  KPD officers obtained a state search warrant for the Honda and seized the firearms. KPD officers identified the first firearm, found near the stereo system, as a Taurus Spectrum .380 caliber, SN 1F039977. KPD officers identified the second firearm, found inside the clothes hamper, as an Intratec 9mm Luger Model AB-10, SN A050018.[5] They also located TREISMAN's wallet in the cupholder between the seats. In addition to other items, the wallet contained the following, each with a photograph of TREISMAN:

a.  State of Washington Identification Card for Alexander Hillel

TREISMAN, with date of birth December 19, 2000;

---

[5] It is well known that Dylan Klebold and Eric Harris carried out the shootings at Columbine High School using an Intratec TEC-9, among other weapons. While the TEC-9 is not illegal to own, the firearm is not designed for everyday practical use, such as concealed carry, accurate target shooting, or hunting. JTTF Investigators have not determined TREISMAN purchased his TEC-9s because of their use in the Columbine shootings; however, we note that TREISMAN owns not one, but two of the notorious firearms used in one of the most famous school shootings.

9

b. State of California Driver License, for Alexander Hillel TREISMAN, with date of birth December 19, 2000; and

c. State of Florida Driver License, for Alexander S. Theiss, with date of birth March 29, 1995.[6]

19.     KPD officers arrested TREISMAN for carrying concealed weapons. During a search incident to the arrest, KPD officers seized from TREISMAN the Device, which had been in his right front pants pocket.

20.     KPD notified FBI agents and Task Force Officers with the FBI Charlotte JTTF (hereafter "JTTF Investigators") of their investigation and the arrest of TREISMAN.

**INITIAL INTERVIEW**

21.     JTTF Investigators viewed via closed circuit television an interview of TREISMAN conducted by KPD officers at KPD headquarters. The officers issued *Miranda* warnings and TREISMAN waived his rights and agreed to speak.  During that interview, TREISMAN provided his telephone

---

[6] The Florida Driver License displayed a star in the upper right-hand corner purporting to be Real ID compliant. JTTF Investigators contacted the Florida Department of Law Enforcement and learned the Driver License is counterfeit.

10

number as (206) 293-0658 [defined previously as the Device to be searched].
KPD officers asked TREISMAN about hand drawings of swastikas, a plane
crashing into a building, and destroyed buildings, and the books found in his
van. TREISMAN conveyed to the interviewing officers that he had an
interest in terrorist incidents and mass shootings, and that he watched
YouTube videos and read Wikipedia articles about such incidents. KPD
officers also asked TREISMAN about his friends and family. TREISMAN
conveyed that many of his friends had recently stopped interacting with him
because of remarks and jokes he made in reference to incidents such as mass
shootings and the 9/11 terrorist attacks. TREISMAN denied having an
intent to harm anyone.

## JTTF INTERVIEW OF ALEXANDER TREISMAN

22. The next day, JTTF Investigators interviewed TREISMAN at the
Cabarrus County Jail. Prior to any questioning, the JTTF Investigators
presented and reviewed an Advice of Rights form with TREISMAN.
TREISMAN agreed to speak to the JTTF Investigators and signed the form,
waiving his rights. The JTTF Investigators then explained that lying to
federal agents is a crime and showed TREISMAN a copy of Title 18, United
States Code, Section 1001. TREISMAN initialed the copy of the statute
indicating he understood. The JTTF Investigators then stated they were not

11

questioning TREISMAN regarding any of the state charges but were concerned only with possible terrorism. TREISMAN indicated he understood.

23. The JTTF Investigators asked for consent to search TREISMAN's wireless telephone and computers. TREISMAN refused, saying he wanted to protect his privacy.

24. The JTTF Investigators asked TREISMAN about international travel. TREISMAN initially denied traveling internationally but later said he traveled to Canada on vacation with his mother.[7]

25. TREISMAN admitted he had an interest in terrorism and reads Wikipedia articles on the subject. He has lost friends because of his joking about incidents such as 9/11.

26. TREISMAN plays video games, including first-person shooter games. TREISMAN denied ever threatening to harm anyone in "the real world."

─────────────────

[7] A lease agreement in TREISMAN's van indicated he leased an apartment, in or around 2017, in Montreal under the alias Theiss, as found on the counterfeit Florida Driver License. JTTF Investigators have not determined whether TREISMAN used the counterfeit Florida Driver License to lease the apartment.

12

27.     TREISMAN traveled across the country starting in Seattle, Washington. He traveled to Long Beach, California and stayed there for a period of weeks to obtain a driver's license. He said it was easier to obtain a driver license in California than in Washington. TREISMAN stopped in Kansas and purchased two firearms. He stopped in St. Louis, Missouri, and visited someone nicknamed "Gunter." TREISMAN did not know Gunter's true name, and could not recall Gunter's exact telephone number but provided several digits. He traveled to New Hampshire and purchased a firearm. He stopped in New York City, New York, and visited the 9/11 Memorial. He traveled to West Virginia and purchased another firearm. He then traveled through Virginia into North Carolina. TREISMAN stopped in Fayetteville, North Carolina, and met up with Gunter.[8] TREISMAN and Gunter went to Range 56, an unguarded and unmonitored range, and shot TREISMAN's weapons.

---

[8] TREISMAN was evasive on the topic of his time in Fayetteville, North Carolina. He initially said he was there alone. TREISMAN admitted later in the interview that TREISMAN flew out Gunter to North Carolina and went shooting with Gunter in Fayetteville.

13

28.    TREISMAN confirmed using the online alias "flippymapper" on YouTube.[9]

29.    JTTF Investigators showed TREISMAN a comment posted to Reddit, in or around the end of February 2020, by user "AlextheBodacious" stating the following:

> How do I dox in sub rosa?
>
> I keep dying and being called pedo and want to kill people in real life about it.  How can I find the addresses of those I hate and execute them for their crimes? [10]

TREISMAN initially stated he could not recall using the online alias AlextheBodacious or posting the statement.[11] Later in the interview, JTTF

---

[9] JTTF Investigators conducted open-source searches and located several online accounts believe to be used by TREISMAN, prior to conducting the interview. Several videos on YouTube showed TREISMAN playing a video game called Sub Rosa, a multiplayer first-person shooter game.

[10] Based on my training and experience, I know that to "dox" someone is an Internet-based practice where users search for and publish private information about an individual or organization with malicious intent. This information can include true name, telephone number, and physical address.

[11] JTTF Investigators located a U.S. passport application for TREISMAN where he listed the email address alexthebodacious@gmail.com. JTTF Investigators conducted an open-source query on that email address prefix

14

Investigators again, directly asked TREISMAN if AlextheBodacious was his Reddit user name. TREISMAN sat back and began to affirmatively nod, but then stated he could not recall. Later, JTTF Investigators asked TREISMAN what his intent was in making the statement on Reddit. Despite claiming repeatedly that he [TREISMAN] could not recall using the online alias or posting the statement, TREISMAN replied, "Shock factor."

30.     TREISMAN prepared a written statement denying an intent to harm anyone and claiming all online threats were part of a persona.

31.     JTTF Investigators then turned the interview to the firearms.

32.     JTTF Investigators questioned TREISMAN about the Sig Sauer AR rifle (SN 20J041880). TREISMAN stated he purchased this firearm in New Hampshire through a seller he met on Armslist.com[12]. TREISMAN stated he could not recall if he accessed the website via a cell phone or

---

and identified a Reddit account with that online alias. JTTF Investigators have not yet confirmed the email address is associated with the Reddit account. However, TREISMAN uses the same alias, alexthebodacious, on the Steam gaming platform according to his friend, Shawn Adams.

[12] Armslist.com is a classified advertisements website, accessible through a web browser, for firearms and firearms accessories. Options on the website allow buyers to search for sellers willing to ship or to sell in person. Not all sellers who use the site are required to have an FFL, and identifying the end possessor in those purchases is very difficult.

15

computer. TREISMAN stated he was pretty sure the seller was a resident of New Hampshire. TREISMAN stated he met the seller in a parking lot to purchase the rifle for $800, and it was a 5.56 caliber rifle. TREISMAN stated he could not remember the seller's name. TREISMAN stated he was living in a hotel in New Hampshire during the purchase of this firearm. TREISMAN stated he bought this firearm in the past couple of weeks between California and now, which he believed occurred between March 2020, and the present time. TREISMAN stated he also had another upper[13] that he bought as a kit in Seattle.

33. JTTF Investigators questioned TREISMAN about the Intratec 9 (Model AB-10, SN A050018). TREISMAN stated he bought it in Kansas off Armslist. TREISMAN stated he purchased this firearm loaded, with a round in the chamber, and that he bought it approximately last year or so. TREISMAN did not remember the guy's name he bought it from.

---

[13] Per Title 27, Code of Federal Regulations, section 478.11, a firearm frame or receiver is "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Some firearms are constructed with receiver assemblies, which are split into an upper assembly and a lower assembly, each housing different components. JTTF Investigators determined TREISMAN possessed two upper assemblies, or "receivers," and two lower assemblies, or "receivers," in his van.

34.     JTTF Investigators questioned TREISMAN about the Kel-Tec Sub-2000 (SN FTC43). TREISMAN originally stated he bought this firearm in Kansas, and then corrected himself that he purchased this firearm from a home-based Federal Firearms Licensee (FFL) in Seattle, Washington. TREISMAN told agents he bought some other guns in Kansas, but not this one. TREISMAN told agents he bought this firearm off Armslist, but through an FFL. TREISMAN stated, "I did a background check and everything and came back clear, so." JTTF Investigators asked TREISMAN what identification he used to purchase the firearm. TREISMAN responded, "I don't recall." JTTF Investigators asked TREISMAN if he used the Florida Driver License. TREISMAN responded, "No, not that I recall." JTTF Investigators told TREISMAN that the FFL had a copy of TREISMAN's counterfeit Florida Driver License and asked TREISMAN why he had a different story than the FFL. TREISMAN told agents that he wasn't saying that, he was just saying that he could not recall.  JTTF Investigators had obtained, prior to their interview of TREISMAN, a photocopy of the ATF Form 4473 related to the purchase of the Kel-Tec Sub 2000 from an FFL in Snoqualmie, Washington.  The ATF Form 4473 lists the purchaser as "Alexander NMN Theiss" with the date of birth of March 29, 1995.  The name

17

Alexander Theiss, with the date of birth March 29, 1995, is consistent with the false identification found in TREISMAN's wallet on May 28, 2020.

35.     JTTF Investigators questioned TREISMAN about the Taurus Spectrum pistol (SN 1F039977). TREISMAN stated he bought this firearm within the past couple of weeks in West Virginia from a seller he met on Armslist. TREISMAN stated he thought it was brand new because the seller sold it to him in the box with the manual for $200. TREISMAN told agents he could not remember the seller's name or handle from Armslist.

## ADDITIONAL ONLINE INVESTIGATION

36.     JTTF Investigators conducted online searches for the online aliases used by TREISMAN, and located a comment posted "1 year ago" to Reddit by user AlextheBodacious, believed to be TREISMAN:

> Toolhead, more like narcissistic bitch who cant take an insult and would die in the gaids of 25
>
> First post in 6 months
>
> But leme tell you FUCK toolhead!!! I hate him!!

18

He dishes it out but he cant take it, I call him a mouse furry and a wagie cuck virgin and he bans me from his minecraft server! Im shook! **I want to do a school shooting!** What do I do, /b/?

[emphasis added]

### FBI INTERVIEW OF SHAWN ADAMS

37.    JTTF Investigators conducted commercial database searches on TREISMAN's last known address in Seattle, Washington, and identified Shawn Adams, a resident of St. Louis, Missouri, as a possible associate. The name "Shawn Adams" appears on a Green Dot prepaid Visa card that was located in TREISMAN's wallet. Adams' telephone number substantially matched the telephone number for Gunter provided by TREISMAN.

38.    Investigators from the St. Louis Division of the FBI interviewed Adams on May 30, 2020. Adams described TREISMAN as an outcast that seemed to be driving around the country. Adams remained in contact with TREISMAN even though he felt "put off" by TREISMAN's far right racist comments and an apparent interest in mass shootings. TREISMAN made many comments about "hating niggers" and talked of killing African Americans. TREISMAN spoke about mass shootings in a positive way and seemed interested in past known school shooters such as those at Columbine.

19

39.    During the interview, Adams accessed his personal cellular telephone and provided contact information, tag names, and other information associated with TREISMAN. Adams communicated with TREISMAN with the following contact numbers and vanity names: phone contact "Alex the Exterminator" at (206) 293-0658; and "Alex the Bodacious" on the Steam gaming website.[14]

40.    Adams told the agents that he first met TREISMAN in person on March 31, 2020, when TREISMAN paid for him [Adams] to fly to Los Angeles, California. They spent a few days driving around California and just hanging out. TREISMAN was strange and made comments about shooting homeless people. At one point, TREISMAN referred to shooting the homeless as "taking out the trash." Adams noted that TREISMAN was extremely interested in mass shootings.

41.    While in Hollywood, California, Adams and TREISMAN were hiking up a trail to the Hollywood sign that overlooks the city. TREISMAN said, "Forty percent of murders go unsolved." Adams became more

_____

[14] Telephone number (206) 293-0658 is the phone number of the Device to be searched. The Steam gaming user name of "Alex the Bodacious" is the same user name referenced above in association with the Reddit account of "AlextheBodacious."

Case 1:20-cr-00208-UA   Document 42-1   Filed 02/03/21   Page 23 of 39

uncomfortable and "put off" by TREISMAN. Adams did not see any guns with TREISMAN while on this trip. TREISMAN told Adams that he [TREISMAN] would have definitely done a school shooting in Seattle if he [TREISMAN] would not have left the city. TREISMAN did not give specifics of a plan to carry out the threat.

42.    In April 2020, Adams and TREISMAN went to an open-air gun range somewhere near Fayetteville, North Carolina. Adams recalled seeing three guns in TREISMAN's possession. They fired the three guns while at the range. Adams described the guns as follows: an AR-style rifle .223; an AR-style rifle with collapsible stock; and a 9mm handgun with Ruger magazines. While TREISMAN was firing his weapons, he would call out the names of well-known mass shooters, such as the Columbine shooters, as he pulled the trigger. Adams tried to distance himself from TREISMAN after this trip. TREISMAN was too "right wing" and racist.

43.    Adams showed the interviewing agents his recent cellular text messages with TREISMAN. Adams described one recent text message that he [Adams] received from TREISMAN's phone (206) 293-0658,[15] on May 25,

_____

[15] Telephone number (206) 293-0658 is defined above as the Device to be searched.

21

2020. TREISMAN's message said, "epic school shooting". Adams described this as a typical message that TREISMAN would send talking about school shootings in a positive way.

44. At the end of the interview, Adams consented to a search of his telephone and signed a Consent to Search form.

## SEARCH OF SHAWN ADAMS' TELEPHONE

45. Pursuant to Adams' consent, the FBI conducted an initial analysis of Adams' cellular telephone. On May 25, 2020, TREISMAN sent Adams a text message, "dude epic school shooting" and "wish I coulda been there to see it." TREISMAN then sent Adams a link to a news article about a number of shootings that occurred in St. Louis over the Memorial Day weekend in 2020, in which 19 people were shot and 4 killed. Adams responded to TREISMAN, "Welp that's fucked I expected nothing less especially during this shit."

## TECHNICAL TERMS

46. Based on my training and experience, I use the following technical terms to convey the following meanings:

22

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using

23

photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

24

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some

25

PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing

26

the Web, sending and receiving e-mail, and participating in

Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to

contact an individual through an alert, or a numeric or text

message sent over a telecommunications network.  Some pagers

enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address")

is a unique numeric address used by computers on the Internet.

An IP address is a series of four numbers, each in the range 0-

255, separated by periods (e.g., 121.56.97.178).  Every computer

attached to the Internet computer must be assigned an IP

address so that Internet traffic sent from and directed to that

computer may be directed properly from its source to its

destination.  Most Internet service providers control a range of IP

addresses.  Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is,

frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other

electronic devices that communicate with each other.  Due to the

27

structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

47.    Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, Internet access device, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence of a crime and evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

48.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

49.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used,

28

the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team

29

and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

50. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

51. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of

30

this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

52. Based on my training and experience, there is probable cause to believe TREISMAN received and transported firearms and ammunition in interstate commerce with the intent to commit an offense, punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 924(b), and knowingly provided false information in connection with the acquisition of a firearm, in violation of Title18, United States Code, Section 922(a)(6). Specifically, TREISMAN used a false name in the acquisition of a Kel-Tec firearm. In addition, he liquidated his inheritance, traveled across the country purchasing firearms using cash, with fraudulent identification, with the intent to commit a mass shooting, an offense punishable under numerous statutes as a felony. TREISMAN has repeatedly expressed adoration for mass shooters and a desire to commit a mass shooting himself.

31

53. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/S/ Ronald L. Godfrey
Ronald L. Godfrey
Special Agent
Federal Bureau of Investigation

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 3rd day of June, 2020, at 12:54 p.m.

JOE L. WEBSTER
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF NORTH CAROLINA

32

## ATTACHMENT A

The property to be searched is a Samsung S9 wireless telephone contained inside an Otter Box protective case, black in color, associated with telephone number (206) 293-0658, serviced by Sprint, and belonging to Alexander TREISMAN, born December 19, 2000 (the "Device"). The Device is currently located at the Kannapolis Police Department (KPD), 401 Laureate Way, Kannapolis, North Carolina.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.    All records on the Device described in Attachment A that relate to violations of Title 18, U.S.C. Section 924(b), that is receiving and transporting firearms and ammunition in interstate commerce with the intent to commit an offense, punishable by imprisonment for a term exceeding one year, and Title18, U.S.C. Section 922(a)(6), knowingly using a false identification in the acquisition of a firearm, and involve **Alexander TREISMAN** since **January 1, 2018**, including:

   a. information recording **TREISMAN's** schedule or travel from **January 1, 2018** to the present;

   b. records related to firearm and ammunition purchases and sales;

   c. records related to the acquisition of any firearms, ammunition, explosives, tactical gear, or any other weapon or equipment to conduct assaults, mass shootings, murders, or terrorist attacks,

   d. communications, web searches, and any other records relating to assaults, mass shootings, murders, and terrorist attacks, or the planning thereof;

   e. records regarding any use of or obtaining fraudulent identification;

f.  records related to firearms- or tactical-training;

g.  records related to social media and gaming platform usage, including user names and buddy lists;

h.  bank records, checks, credit card bills, account information, and other financial records;

i.  records of Internet Protocol addresses used;

j.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic

2

storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3