**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 21-4687**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ALEXANDER HILLEL TREISMAN, a/k/a Alexander S. Theiss,

Defendant – Appellant.

───────────

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. William L. Osteen, Jr., District Judge. (1:20–cr–00208–WO–1)

───────────

Argued: March 10, 2023                    Decided: June 23, 2023

───────────

Before KING, WYNN, and QUATTLEBAUM, Circuit Judges.

───────────

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge King and Judge Wynn joined.

───────────

**ARGUED:** Daniel Micah Blau, DANIEL M. BLAU, ATTORNEY AT LAW, PC, Raleigh, North Carolina, for Appellant. Graham Tod Green, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Sandra J. Hairston, United States Attorney, Craig M. Principe, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Winston-Salem, North Carolina, for Appellee.

───────────

QUATTLEBAUM, Circuit Judge:

Alexander Hillel Treisman appeals the district court's denial of his motion to suppress evidence that police discovered while searching his van without a warrant. But warrantless searches of vehicles carried out as part of law enforcement's community caretaking functions do not violate the Fourth Amendment if they are reasonable under the circumstances. And because the record here supports the district court's conclusion that the officers acted reasonably in searching the van under their community caretaking functions, we affirm.

I.[1]

When she came to work in late May 2020, Crystal Wright—a manager of the Fifth Third Bank's Kannapolis, North Carolina branch—noticed a van in the bank's lot in the same spot it was parked at the close of business the day before. Concerned, Wright called the Kannapolis Police Department (the "KPD") seeking assistance.

Officer Nathan Lambert responded, arriving around 11:00 am. The van had an expired California tag. Its front cabin was separated from the rear cargo area. The van had front cabin doors, rear doors and a door on the passenger side of the rear cargo area. Officer Lambert could see inside the front cabin, but the rear cargo area did not have any windows, making it impossible to look inside. It also had an air conditioning unit on top, but, since the car was turned off, it was not running.

---

[1] The facts are based on the testimony from the hearing on Treisman's motion to suppress.



Officer Lambert tried to electronically identify the van's owner but was unable to

do so. Nor could he confirm the vehicle's identification number because it was covered by

papers. From the passenger side window, Lambert observed an assault rifle, a handgun

box, an ammunition box, a Tannerite container—a legal target shooting product that can

also be used to make explosives—a container of pills and a suitcase.




Lambert then went inside the bank to meet with Wright. He learned that the bank's

security cameras did not record activities in the area of the parking lot where the van was

located.

Another officer, Brandon Wagner, arrived around noon, as Lambert was meeting

with Wright inside the bank. Wagner walked around the van where he noticed the same

3

things as Lambert. He also saw that the assault rifle had a scope and an extended magazine and that the side door to the rear cargo area was slightly ajar.

Lambert and Wagner talked with their supervisor, Sergeant Tim Lafferty, about the situation. They all felt that, while not illegal, it was highly unusual for a van containing a high-powered rifle, a pistol, ammunition and explosives in plain view to be left overnight and unattended in a bank parking lot. And Wright expressed safety concerns to the officers about the contents of the van.

Lafferty also questioned whether there might be someone inside the van needing help. Once Lafferty raised this concern, Lambert indicated that the California tags and suitcase in the front seat suggested someone might be living in the van. He worried that if someone was in the back of the van, the heat might pose a danger since it was a hot day and the air-conditioning unit on the top of the van was not running. And the guns and ammunition in the front of the van added to Lambert and Lafferty's concerns. They both thought that unless something was wrong, the owner and occupants would not likely leave valuable and potentially dangerous items in plain view. Lafferty noted that North Carolina law permits searches in the event of an urgent medical situation.[2] After discussing these

---

[2] N.C. Gen. Stat. § 15A-285, titled "Non-law-enforcement actions when urgently necessary," provides

> When an officer reasonably believes that doing so is urgently necessary to save life, prevent serious bodily harm, or avert or control public catastrophe, the officer may take one or more of the following actions:
>
> (1) Enter buildings, vehicles, and other premises.

4

factors, the officers agreed that they should check to see if someone was in distress in the back of the van.

Around 12:30, without knocking or announcing their presence, Lambert and Wagner pulled the handle on the slightly ajar side door to the back of the van. The door suddenly opened. Startled, the officers drew their guns. They did not see anyone inside the van but noticed more gun cases. But combined with what they had seen in the front seat, the officers felt these additional guns in an abandoned, and unsecure, vehicle presented a public safety concern.

Soon after that, Lafferty arrived on the scene. He looked through the van to see if the others had missed someone in distress. Lafferty agreed that the van—including its contents—created public safety concerns. All the officers worried that visible firearms, ammunition and explosives might entice someone to break in and steal those items and use them to harm others. The officers also agreed that they needed to safekeep the valuable items for the owner of the van.

In the meantime, Captain Justin Smith had arrived. Wright asked Smith if the KPD could tow the van. KPD policy provided that requests to tow vehicles on private property should be referred to the city zoning administrator. The officers did not call the zoning administrator. From his experience, Smith felt that, due to the firearms, the zoning

---

(2) Limit or restrict the presence of persons in premises or areas.

(3) Exercise control over the property of others.

An action taken to enforce the law or to seize a person or evidence cannot be justified by authority of this section.

5

administrator would defer to the police in deciding whether to tow the van. And, according to Smith, the van needed to be moved because of the unsecured firearms. The policy also required that a vehicle be "abandoned," and that the property owner be unable to tow the vehicle "without police assistance." As for abandonment, the van was left overnight in the bank's private lot. Also, the bank was unable to tow the van because its towing company refused to tow vehicles containing firearms. The policy also required the property owner to sign a tow request form, which Wright signed. So, the officers believed that they could tow the van under KPD policy.

Before towing, the officers conducted an inventory search of the van's contents as stated by the policy. They began looking for and documenting valuables. During this inventory search, officers also found books about survival, bombmaking, improvised weapons and Islam. Sergeant Lafferty looked at each firearm and ran the serial numbers. Additionally, they found several electronic devices, a drone and a large amount of cash banded and sealed in bank bags.[3]

After discovering the cash in the bank bags, the officers suspected the owner of criminal activity. So, they decided to obtain a search warrant. Before obtaining the warrant, they stopped the inventory search and towed the van to a KPD storage area.

After the police towed the van, Treisman returned to the bank and asked about his van. The bank manager called the police, who came and detained Treisman. KPD obtained a search warrant from a state court judge to search the van. Later, relying on evidence from

---

[3] The FBI determined Treisman inherited the money from his father and thus was the legal owner of the money. The money was later returned to Treisman.

6

the van, FBI agents obtained a federal search warrant for Treisman's cell phone. Though the phone included no evidence of criminal activity related to the guns, explosives or cash, it did contain child pornography images. And based on those images, a grand jury indicted him for possession of child pornography and for transportation of child pornography. *See* 18 U.S.C. § 2252A.

II.

Before his trial on the child-pornography charges, Treisman moved to suppress evidence related to the search of his van. Treisman argued that the officers did not have an objectively reasonable belief that an emergency existed that required them to immediately enter the van without a warrant to see if anyone was in medical distress inside. He also argued that the officers did not have legal authority to tow the van. Last, he argued that the inventory search was a pretext for a warrantless criminal investigation.

The district court held an evidentiary hearing. Officers Lambert, Wagner, Lafferty and Smith, as well as the bank's branch manager Wright, testified. After the hearing, the district court denied Treisman's motion.

The court found the testimony of the officers credible. It then held that the officers searched the back compartment of the van as a reasonable exercise of their community caretaker functions and not for the purpose of a criminal investigation. It first explained that the officers were presented with an unusual situation that raised significant public safety concerns. It then noted that the rifle, ammunition and explosives in the cab of the

7

van were visible and accessible and that breaking and entering into vehicles had increased in the area.

The court also found that the officers reasonably believed that someone might be in the back of the van in need of help. The court explained the California license plate, the suitcase and the other items in the front of the van all suggested someone was living in the van. The court also credited the officers' testimony that the owner or occupants, if not in distress, would not likely leave firearms and ammunition in plain view or leave the side door ajar. In addition, the court noted the hot weather and that the air conditioning unit was not running. After considering that evidence, the court determined that the facts were "sufficient to support a finding that" someone might be in distress in the back of the van and that the officers reached an "appropriate conclusion." J.A. 484–87. And it therefore determined the officers' decision to enter the rear of the van was appropriate under either N.C. Gen. Stat. § 15A-285, which permits warrantless searches in the event of urgent medical situations, or the officers' general community caretaking function.

The district court also held that the officers acted reasonably in impounding and towing the van. The court explained that the guns, ammunition and explosives in the front of the van and the additional unsecured firearms in the rear of the van created a public safety concern. And the court found that the officers complied with the KPD policies based on Wright's request for the police to tow the vehicle, the statement from the tow company that it refused to tow vehicles with firearms and the officers' belief that the city zoning administrator would defer to the police due to the presence of firearms.

8

Finally, the district court found that the officers conducted the inventory search for the purpose of safekeeping valuables and "not a pretext for a criminal investigative search." J.A. 495–96, 505–06. In reaching this conclusion, the court relied on the fact that that the officers did not seize any items from the van as would have been done in an investigatory search.

After the court denied Treisman's motion, he pled guilty to possession of child pornography and transportation of child pornography. Under the plea agreement, Treisman reserved the right to appeal the adverse suppression ruling.[4]

III.

Treisman presses two primary arguments on appeal. First, he argues the district court erred in concluding that the officers had reasonable grounds to enter and search the van under the community caretaking doctrine. Second, he insists that the court also erred in concluding that the officers' warrantless impoundment and inventory search were reasonable under their community caretaking functions. We address these two arguments in turn.

---

[4] The district court sentenced Treisman to 156 months imprisonment and 15 years supervised release. Treisman timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

9

A.

1.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. For that reason, the "touchstone" of any Fourth Amendment analysis is reasonableness. *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977). To evaluate reasonableness, courts must determine whether the government's interest in undertaking a search or seizure "outweigh[s] the degree to which the search invades an individual's legitimate expectations of privacy." *Maryland v. King*, 569 U.S. 435, 461 (2013). And this balance "depends on the context within which a search takes place." *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985).

Police officers often need some suspicion of criminal activity to reasonably search or seize an individual or property. *See, e.g., United States v. Kellam*, 568 F.3d 125, 136 (4th Cir. 2009) (permitting traffic stop if officers reasonably suspect the driver committed a traffic violation); *United States v. Ross*, 456 U.S. 798, 820–21 (1982) (permitting vehicle search if officers develop probable cause that the vehicle contains evidence of criminal activity). But even without suspicion of criminal activity, a search of a vehicle may be reasonable when police officers are exercising what the law calls community caretaking functions.[5]

---

[5] Community caretaking may not be the most well-known of Fourth Amendment principles. But being lesser known hardly makes something unimportant. Take sports. Tom Glavine and John Smoltz were the most well-known pitchers on the 1991 Atlanta Braves pitching staff that led the Braves to the World Series. But Steve Avery, a lesser-known pitcher, was important to the team's success. In fact, in the National League Championship

10

The Supreme Court first mentioned this concept in *Cady v. Dombrowski*, 413 U.S. 433 (1973). There, the Court explained,

> Some [contacts between citizens and police involving automobiles] will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers [] frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions . . . .

*Id*. at 441. Elaborating, the Court described community caretaking functions as conduct "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id*. And it also clarified that the test for evaluating whether community caretaking searches violate the Fourth Amendment is reasonableness. *Id.* at 442. In other words, is the search reasonable given the totality of the circumstances?

In *Cady*, Dombrowski's car was broken down on the side of the road after a single car accident. The officers knew that Dombrowski was a police officer and believed he was required to carry a gun. So, after the vehicle was towed, they searched it without a warrant in order to protect the public from the risk that the gun would fall into the hands of someone who was either untrained or might use it purposefully for harm. *Id.* at 436–37, 443. The Court upheld the search of Dombrowski's car, holding that a search of "the trunk of an automobile, which the officers reasonably believed to contain a gun . . . was not 'unreasonable' within the meaning of the Fourth and Fourteenth Amendment." *Id*. at 448.

---

series, he pitched over sixteen scoreless innings and was named Most Valuable Player. Or literature. *Mere Christianity* is probably the most well-known of the Christian author C.S. Lewis' books. But *The Last Battle* from his Chronicles of Narnia series, although lesser-known, contains important lessons.

11

Since *Cady*, the Supreme Court addressed challenges to warrantless searches carried out by police while exercising their caretaking responsibilities. *See, e.g.*, *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976) (explaining that inventory searches of lawfully impounded vehicles fall within officers' caretaking functions and are reasonable under the Fourth Amendment even if conducted without a warrant "where the process is aimed at securing or protecting the car and its contents"); *Colorado v. Bertine*, 479 U.S. 367, 370 (1987) ("[A]n inventory search may be 'reasonable' under the Fourth Amendment even though it is not conducted pursuant to a warrant based upon probable cause."). And citing *Cady* and *Opperman*, we have permitted warrantless searches of vehicles by the police carrying out their caretaking functions when reasonable under the circumstances. *United States v. Johnson*, 410 F.3d 137, 145–46 (4th Cir. 2005) (holding that an officer's search of the glove compartment of a vehicle involved in a crash where the driver is unresponsive was a reasonable attempt to obtain information to help attempt to communicate to assess the driver's medical condition under the community caretaking doctrine).

Recently, the Court revisited warrantless searches by law enforcement as part of their community caretaking functions. In *Caniglia v. Strom*, 141 S. Ct. 1596 (2021), the Court held that the police caretaking functions do not create "a standalone doctrine that justifies warrantless searches and seizures *in the home*." *Id.* at 1598 (emphasis added). But despite this limitation, the Court did not disturb the principle that police officers may conduct warrantless searches of vehicles when called on "to discharge noncriminal 'community caretaking functions,' such as responding to disabled vehicles or investigating accidents." *Id.* (citing *Cady*, 413 U.S. at 441). The test for such vehicle searches, going

12

back to *Cady*, is that they be reasonable under the circumstances. 413 U.S. at 439–40, 442–43.

2.

With that background in mind, we turn to Treisman's arguments. He insists that the officers were not reasonably exercising their community caretaking functions when they searched the back of the van. In advancing this argument, Treisman mainly criticizes the conclusion that the officers satisfied the urgent medical necessity requirement of N.C. Gen. Stat. § 15A-285 or that, under the community caretaking doctrine, they reasonably believed there was someone in the back of the van who was in distress. According to Treisman, this belief is contradicted by the fact that the officers did not think that someone might be in the van until an hour after they arrived and only after Lafferty, who was not even on the scene, suggested it. He also points out that when Lambert and Wagner approached the side door, they did not knock or announce that they were about to enter. Finally, he contends that by drawing their guns, the officers revealed that they were not exercising caretaking functions. Treisman argues the officers used the purported concern about someone in distress as a pretext to conduct an investigatory search.

But we review factual findings from a district court's denial of a motion to suppress for clear error and legal determinations de novo. *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010). We also construe the evidence in the light most favorable to the government as the prevailing party. *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016). And we afford "due weight to inferences drawn from those facts by resident judges

13

and law enforcement officers." *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010) (citation omitted). Following that standard, we find no error in the district court's order.

First, the district court considered the issues Treisman raised. It acknowledged the officers did not initially consider the possibility that an occupant might be in distress. But the court nevertheless credited Lambert and Wagner's testimony that, after speaking with Lafferty, and considering the circumstances described above, they were concerned someone was in medical distress.

The court also considered the officers' failure to knock or announce their presence before entering. But, according to the court, the officers' decision to enter the back of the van was reasonable because of the other evidence—that someone was living in the van, the hot day, that the air conditioning unit was not running, the ajar side door and that the firearms and ammunition were left in plain view in the front of the van.

Finally, the court considered the officers drawing their guns. It explained that it credited the officers' testimony that the way the door suddenly opened startled them. So, the court concluded the officers' drawing their guns when startled was not inconsistent with their testimony that they believed one might be in distress in the rear of the van. [6]

In sum, the district court's findings were not clearly erroneous. And construing the evidence in the light most favorable to the government, we reject Treisman's arguments.

---

[6] In addition to community caretaking, such a medical situation might implicate the exigent circumstances doctrine. *See, e.g.*, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("[O]fficers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). But that issue is not before us so we express no view on whether the facts here reasonably involve exigent circumstances.

14

What's more, Treisman does not meaningfully challenge the district court's alternative conclusion that the officers entered the back of the van to help ensure public safety. *Cady* tells us that warrantless searches of vehicles in the interests of public safety carried out as part of officers' community caretaking functions, if reasonable under the circumstances, do not violate the Fourth Amendment. True, the officers testified that the primary reason they entered the back of the van was to see if someone needed assistance. But they also testified that the presence of an AR-15 style rifle, a handgun case, ammunition and explosive material all in plain view in an apparently abandoned and unsecured vehicle was highly unusual. And once she learned of those contents, Wright expressed safety concerns. We find no error in the district court's interpretation of that testimony to justify the search of the rear of the van based on public safety concerns.

So, we affirm the district court's decision that entering the rear of the van was a reasonable exercise of the officers' community caretaking functions.

## B.

Treisman next argues that the district court erred in concluding that the officers' warrantless impoundment and inventory search was reasonable under their community caretaking functions. According to Treisman, the officers failed to comply with the KPD's requirements for impounding and towing vehicles on private property and the KPD's policies and procedures on inventory searches. Treisman also contends that the officers carried out the search like an investigatory search, not an inventory search. And since the officers impounded the vehicle and conducted the inventory search without a warrant, Treisman argues the officers violated his Fourth Amendment rights.

15

In considering these arguments, we begin with *Opperman*. There, officers impounded a vehicle after multiple parking violations. *Opperman*, 428 U.S. at 365–66. They then conducted an inventory search of the car following their standard practices. *Id.* at 366. During that search, they discovered marijuana in the glove compartment. *Id.* The Court upheld the search. *Id.* at 367. It explained that the officers were acting in their "community caretaking function" of furthering "public safety." *Id.* at 368. The police, the Court explained, may search vehicles that have been properly impounded when the goal is to "secur[e] or protect[] the car and its contents." *Id.* at 373.

Consistent with *Opperman*, our decision in *United States v. Brown*, 787 F.2d 929 (4th Cir. 1986), established the test for warrantless inventory searches on private property. There, we held that police officers may inventory a vehicle without a warrant if: (1) the vehicle is in the lawful custody of the police; (2) the inventory search is routine and conducted pursuant to standard police procedures; and (3) the search aims to secure the car or its contents and not to gather incriminating evidence against the owner. *Id.* at 932. So, we must apply this test in considering Treisman's challenge to the district court's decision.

First, was the van in the lawful custody of the KPD? In answering this first question, we ask "not whether there was a need for the police to impound [Treisman's] vehicle but, rather, whether the police officer's decision to impound was reasonable under the circumstances." *Id.* at 932.

Here, as already noted, the district court found that the officers decided to impound the vehicle and conduct an inventory search out of concerns for public safety and to safekeep the valuables in the van. Similar to our analysis of the officers' decision to search

16

the rear of the van, we have no trouble agreeing with the district court that it was reasonable for the officers to believe that the presence of guns, ammunition and explosives in plain view in the front of the van combined with guns in the unsecured rear area of the van created a public safety concern. Likewise, we agree with the district court that the officers reasonably believed the firearms, cash and other contents discovered in the van were valuables that needed to be safeguarded. So, the conduct of the KPD satisfies the first prong of the *Brown* test. In fact, Treisman offers no real disagreement on this point.

Next, did the officers conduct the search under standard KPD procedures?[7] The KPD has several standard policies relevant here. First, inventory searches are permitted if a "lawful basis exists for taking custody of the vehicle; [t]he inventory is non-investigative (officers may not conduct an evidence search under the guise of an inventory search); [and t]he scope of the search is limited to locating and securing valuables for the mutual protection of the officer, department, and vehicle owner or operator." J.A. 581. Second, the KPD may remove abandoned vehicles from private property if the owner requests, in writing, that police remove the property and is not able to remove the property herself. In addition, the policy provides that complaints about abandoned vehicles on private property

---

[7] For the first time on appeal, Treisman also argues that the KPD inventory search policy impermissibly affords "unfettered discretion" to KPD officers when deciding whether to conduct an inventory search. Op. Br. 35. Because we do not consider new arguments for the first time on appeal unless it would be plain error or would result in a fundamental miscarriage of justice, we find that the argument has been waived and decline to address Treisman's new argument. *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993).

17

should be referred to the Kannapolis zoning administrator.[8] Finally, the KPD policy states that an inventory search should be conducted before a vehicle is lawfully impounded.

After reviewing the policies and hearing from the witnesses at the suppression hearing, the district court found that the officers followed these policies. As already explained, it concluded that the officers' belief that the contents of the van created public safety concerns and that the van contained valuables that needed to be protected provided a lawful basis for taking possession of the van. The court also found that Wright, the bank's branch manager, requested the police tow the vehicle and that the bank could not tow it itself because its tow company would not tow vehicles containing guns. And the court found that the officers conducted the search to secure the valuables and not as a pretext for an evidence search. In reaching this conclusion, the court noted that the officers did not remove any items that would normally be seized—such as the firearms, unusual books or pills—as they normally would have done in a criminal investigatory search.

------

[8] These policies are part of Kannapolis Police Department General Order 900-02, which incorporates the applicable towing procedures from the Kannapolis City Code of Ordinances. Treisman also contends that the district court erred in analyzing whether the Kannapolis City Code of Ordinances violated N.C. Gen. Stat. §§ 20-137.9, 137.10, related to notice being given before the towing of vehicles on private property is authorized. The district court held that state law allows "for cities to create their own code with respect to towing." J.A. 504; *see* N.C. Gen. Stat. § 160A-303 ("A city may by ordinance prohibit the abandonment of motor vehicles on the public streets or on public or private property within the city, and may enforce any such ordinance . . . ."). And the district court found that the Kannapolis City Code provision on towing complied with the North Carolina general statute because it required notice—subject to narrow exceptions—and hearings once a vehicle had been towed. The district court concluded that officers' decision to tow the vehicle in connection with public safety complied with the Kannapolis City Code. Further, we see no error in the district court's factual finding that the KPD officers acted reasonably under the circumstances pursuant to their community caretaking obligations.

18

Treisman does not dispute that KPD had applicable standard procedures for impounding vehicles and inventory searches. Instead, he challenges the district court's conclusion that the officers followed these procedures. He first correctly argues the officers failed to contact the city zoning administrator before towing the vehicle. But the district court considered this fact. It credited the testimony of the officers that, under the circumstances here—an abandoned and unsecured vehicle containing guns—the police did not need to contact the zoning administrator because, based on their experience, that official would defer to the police if the safety of the public was a concern. We see no reversible error here. The policy discusses where the public should direct complaints about abandoned vehicles on private property. It does not preclude the officers' conduct.

Treisman also insists that the officers searched the van intent on finding incriminating evidence, not inventorying its contents. In advancing this argument, he stresses that the officers called out and ran a serial number check on the guns and failed to itemize the guns or cash, recording only "CASH and FIREARMS." But the district court considered this evidence as well. The court credited the testimony of the police officers that they ran the firearm serial numbers because the officers needed to ensure that the firearms were returned to the lawful owner. And the court concluded the failure of the officers to itemize those contents did not outweigh the other evidence that the search was conducted to secure and protect the valuable and potentially dangerous items in the van and not to obtain evidence of criminal activity. It also noted that the officers stopped the inventory search once the cumulative effect of the contents of the van caused the officers

19

to suspect potential criminal activity. At that point, they initiated the criminal search warrant process. We find no error with the district court on these points.

Last, was the search aimed to secure the car or its contents and not to gather incriminating evidence against the owner? As just discussed, the KPD's policies track this third part of the *Brown* test. And once again, the district court did not err in concluding that the officers did not impound the van or conduct the inventory search as a pretext for a criminal investigatory search.

IV.

In conclusion, warrantless searches of vehicles carried out as part of law enforcement's community caretaking functions do not violate the Fourth Amendment if reasonable under the circumstances. We find no error on the district court's determination that the officers searched Treisman's van in exercising those community caretaking functions and not as a pretext for a criminal investigatory search. We likewise conclude that the district court did not err in holding the search was reasonable. Thus, the district court order denying the motion to suppress is

*AFFIRMED.*

20